*Oakley & Thomas* for the plaintiffs—*Boyce* for the defendants.

---

MAES vs. GILLARD'S HEIRS & AL.

Indian tribes were entitled by settlement under the Spanish government to the quantity of land contained in a square league.

APPEAL from the court of the 6th district, the judge of the 5th district presiding.

PORTER, J. delivered the opinion of the court. This is a suit in jactitation, or slander of title. The plaintiff avers himself to be the owner of a large portion of land on Red river, in the possession and right of which he is dis-

turbed by the defendants publicly asserting that he has no title to the premises, but that they are the owners thereof.

To this petition the defendants have answered by denying the plaintiff's title, and setting up one in themselves.

The principles of law which govern suits of this kind were gone into so fully in the case of *Livingston* vs. *Hermann*, that it is deemed unnecessary to notice them particularly in the present instance. The defendants might if they had chosen, have admitted the assertions of which they were accused, and averred their readiness to bring suit. But as they have thought proper to set up their title, the dignity and relative strength of their claims can be passed on and finally decided in this action.— 9 *Martin*, 656.

The plaintiff claims in his petition forty arpents in front on each side of the river, and immediately below these lands a tract of 640 acres, also lying on each side of the river.

The upper part of these 40 arpents is demanded in virtue of an order of survey from the Baron de Carondelet, of date the 14th May 1794, in favor of one Dorotea, a free woman of colour, which ripened into a complete

Western Dis.
October 1828.

MAES
vs.
GILLARD'S
HEIRS.

Testimony taken under the act for perpetuating it, if it be reduced to writing by the attorney of the party applying for it, will be rejected, Those who hold without title, cannot plead less than thirty years actual possession.

Western Dis.
October 1828.

MAES
*vs.*
GILLARD's
HEIRS.

grant the 25th November, 1796. The grantee sold to the petitioner on the 7th April, 1796 The next ten arpents front in descending, in virtue of an order of survey in favour of the petitioner, of date the 15th March, 1797.

And the remainder, twenty arpents, under an order of survey of date the 18th May, 1796, in favour of one Francois Boissier, who sold to the plaintiff all the land embraced by his title on the 1st September, 1804.

The six hundred and forty acres which form the inferior portion of the petitioner's claims, was what is called a settlement right confirmed in favour of Felix Trudeau on the 5th October, 1818.

The complete grant to Dorothea, *f. w. c.* and the other orders of survey in favour of the petitioner and Boissier, have been confirmed by the board of commissioners of the U. States for the western district.

The defendants claim the land covered by these titles or a great portion of it, in virtue of a purchase from the Pascagoula Indians by Colin La Cour on the 9th April, 1795, and an order of survey in favour of Joseph De Blanc of date the 6th May, 1795, calling to bound on the lands of La Cour below, and above by the domain of his majesty.

Western Dis.
October 1828,

MAES
vs.
GILLARD'S
HEIRS.

The court of the first instance gave judgment in favour of the petitioner for all the land claimed by him, and expressed their opinion that the title of the defendants under the Indians, together with that claimed by them under the purchase from De Blanc, did not in fixing the lower boundary at the bayou St. Philip, embrace the premises covered by the plaintiff's titles. From that judgment the defendants appealed.

The titles of the plaintiff are such as give a good right to the land covered by them, and they appear to be properly located. The main questions in the cause, therefore, depend on the title set up by the defendants, under a purchase from the Pascagoula nation of Indians.

The plaintiff has assailed it on three grounds.

1. That the Indians had no right in the soil.

2. That they never sold.

3. That the quantity sold by them is not of sufficient extent to embrace the lands claimed by him.

I. The first cannot be considered an open question in this court. And to those who are desirous of knowing whether all the highest Spanish authorities in Louisiana, for the space of thirty four years, were ignorant of their own

Western Dis,
October 1828,

MAES
vs,
GILLARD'S
HEIRS.

laws, and violated them in sanctioning sales of land by the indians; and whether this court has in various instances, misunderstood the laws of the Recopilacion, we refer them to *the 24th chapter of the 20th book of Soberano's politica Indiana.* Where the right of the Indians to sell, and the fact of their not losing their right in one *pueblo*, or *reduccion*, by being moved to another, is, in our opinion, clearly recognized.

II. The second question is, did they sell to those under whom the defendants claim?

The first proof offered in support of the purchase is contained in a certificate of the commandant of Natchitoches, dated the 9th April 1795, in which he states "that in virtue of the power which had been conferred on him by Mr. Colin La Cour of Pointe Coupée, of having bought the establishment and cultivable lands of the village of the Pascagoula Indians, bounded by the bayou L'Ecor, where the chief was established, and below by another bayou situated on the left bank in descending, which said sale and cession thus made by the said nation, of their proper will, and entire movement, for the price of two hundred and fifty dollars, which I have paid them in cash

Western Dis
October 1828.

MAES
vs.
GILLARE'S
HEIRS.

in the presence of Edward Murphy, Louis Lambre, Antoine Plauché, and Jean Varangue interpreter, besides the crews of two boats. In faith of which I deliver the present to serve as a title to Mr. La Cour, that he may apply to the governor general for a title in form." This instrument is signed by the writer and two witnesses. At the bottom of it is the following: V. B. El Baron de Carondelet.

This court is fully aware of the loose manner in which business was transacted, and acts passed, under the former government of this country, and we have felt every desire to disregard the forms of the instruments of those times, and give them effect, according to the intention of the parties. But there must be some limit to this favourable view, and we think this case presents one. The act is not only devoid of form, but it essentially wants substance. The parties who are said to have sold their land never signed or put their marks to it. It does not appear they were present when it was drawn up. Or if they were, that it was read over to them, and that they assented to its contents. It is not an authentic act. It is not under oath, and it is *ex parte*. It comes too from the agent of the vendee, a

Western Dis, circumstance well calculated to weaken any
October 1828, confidence in it.

MAES
*vs.*
GILLARD'S
HEIRS.

It may perhaps strengthen the other evidence in the cause, so far as it corroborates that evidence, but as to those facts of which there is no other proof it is not entitled to the least consideration.

The proof given on the trial in support of the sale is as follows:

The evidence shews that the Indians moved off from their settlement on Red River about the time mentioned in the commandant's certificate.   *St. André* says he has heard of *La Cour's* purchase from the Indians.   *Ganché* states in his evidence, that the chief who *sold* the land to *La Cour*, lived at *Gaillard's* place. *Huit* believes that *La Cour* bought the whole of the Indian land—*Hoffman* swears also, that he believes it.

In addition to this parol evidence given in court, the testimony of witnesses taken before the board of commissioners, was read on the trial without objection.   Three of these witnesses positively swear to a sale, one of them states he was the agent for Indian affairs; that he was the interpreter when the bargain was made between *La Cour* and the Indians.   Two

others swear that they had much conversation Western Dis.
*October* 1828.

Maes
*vs.*
Gillard's
heirs. with many of the Indians at the period of their removal to bayou Bœuf, and that they said they had sold their lands on Red river to La Cour.

In the case of *Sanchez* vs. *Gonzales*, this court decided that under the former government of Louisiana, a verbal sale of immoveables was valid: the evidence in this case coupled with the uninterrupted possession of the vendee and his successors for nearly thirty years previous to the commencement of this suit, satisfies us that La Cour did purchase as the defendants allege.     *4 Martin.*

III. The next point in the cause is, how much land did the Indians sell?

As the certificate of the vendees' agent does not, in our opinion, establish any fact, and as the testimony of Varangue, taken under the law for perpetuating evidence, must be rejected as written by the attorney of the party whose interest it was to preserve it, we lay out of view the boundary of the *bayou des Ecors*, the proper location of which was the subject of so much testimony in the court below.   The parol evidence which establishes the sale gives no boundary.   It merely proves

Western Dis
October 1828.

MAES
vs.
GILLARD'S
HEIRS.

the Indians sold their land on Red River.—
All the evidence goes to shew that their prin-
cipal village was at the place where the de-
fendants now live.—10 *Martin.*

The quantity of land to which tribes of In-
dians were entitled under the Spanish govern-
ment, has been contested in this instance, as it
has been in every case of this description that
has come before the court. One party urges
that it was a league round of the village in
every direction. The other contends it was
but a league square.

In the case of *Reboul* vs. *Nero,* this tribunal
declared that Indians were entitled by law to a
league in extent round their village; whether
that opinion was required for the decision of
the case, does not clearly appear from the re-
port of it. In the case of *Martin* vs. *John-
ston,* the court referring to that decision, said
it was unnecessary to determine the question,
for allowing the Indians much less, the titles of
those who claimed under them in that action,
would embrace the property in dispute. In
*Spencer's heirs* vs. *Grimball,* the case was
decided on the confirmation by congress, and
an opinion on this point expressly waved.—5
*Martin,* 490, 655, 6, 355.

Western Dis.
*October* 1828.

MAES
*vs.*
GILLARD'S
HEIRS.

The only law we can find which defines the extent of Indian settlements, and the quantity of land to which they have a right in virtue of them, is found in the 6th book of the Recopilacion, and is the 8th law of the 3d title of that book.

The translation of it, as given in the case of *Martin* vs. *Johnston*, is substantially correct. It is in these words: "The seats on which the villages of Indians shall be placed, shall be such, as are all well provided with water, arable land, and woods, and to which there may be easy access, and they shall have a common of one league in extent, where their cattle may graze without being mixed with those of the Spaniards."

These expressions of a "a common of one league in extent," are given in Spanish by the following: *un exido de una legua de largo*, and tho' the true meaning is not quite free from doubt, it does not appear to us, that they support the construction of a league in extent, round the village in every direction. Nothing of there being a league *round the village*, is said in the law. The common is to be of a league in extent. And by giving a league in every direction, there would be a common of

MAES
vs,
GILLARD'S
HEIRS.

two leagues in extent at every point of the compass.

This construction is somewhat opposed to the reasons given in the law for granting land to the Indians. The avowed object is, to prevent their flocks mixing with those of the Spaniards. And that object would certainly be better attained by granting them a league in every direction from their village. But other provisions of the laws of Indians deprive this argument of a great deal, if not all of its force. By them Spaniards are prohibited from placing their flocks of large animals (*ganado mayor*) within a league and a half of the ancient Indian settlements, and their flocks of smaller animals (*ganado menor*) within half a league. In regard to the new settlements, the prohibition extends to double this distance. These restrictions rendered it unnecessary to give the Indians the extent of a league in every direction round their villages for their cattle. The appellants have, however, relied on these laws, to shew that the Indians were entitled to all the lands on which the Spaniards could not pasture their flocks. But nothing in our judgment can be more unfounded than this pretension, for it would make the quantity of

Western Dis
October 1828.

MAES
vs.
GILLARD'S
HEIRS.

soil which it is supposed was given to the Indians when they were settled by the government, depend on the kind of cattle, the white men approached them with. If it was a *ganado mayor*, they had a league and a half in extent around them; but if a *ganado menor* was brought near them, their right diminished to half a league from their village. These laws were evidently political regulations, for the better preserving harmony among the different races of men who formed the population of these colonies, and for the protection of that race, on which they had inflicted so much injury, when it first discovered and settled the country.—*Recopilacion de las Indias. liv.* 4, *tit.* 12, *law* 12, *ibid liv.* 6, *tit.* 3, *law* 20.

The government of the United States have so understood these laws in limiting their confirmation of the title to the quantity contained within a league square; and admitting with one of the counsel for the appellants, that by an ordinance passed in 1754, viceroys and governors were not limited to the quantity of a league, if a larger portion of soil was necessary for the use of the Indians, there is no evidence before us of the numbers of this tribe which would authorise us to conclude that a

Western Dis.
October 1828.

MAES
vs.
GILLARD'S
HEIRS.

greater quantity of land, than that embraced by a league square was necessary for them. The grant of the governor does not establish it, for it places them on the hills near the bayou Rigolet de bon Dieu, in descending. If they afterwards scattered along the bank of the river so as to cover a much larger space of ground, and for their own convenience fixed their lower boundary out of the league; nothing in the evidence induces us to believe that the Spanish authorities ever consented to this extension of the limit below, on any other consideration, than that it should be proportionably contracted above.

The next question is, how should this league be located? The appellants seemed to concede on the argument, that if their claim was reduced to the quantity of a league square, they preferred taking it from their lower boundary. This conclusion is that to which this court would have come, because the lower boundary is established beyond all contradiction, and the upper is doubtful.

The appellee assuming it to be a fact, that the lower bluff where the heirs of Gillard are settled, had been the upper boundary by which the Indians sold; insists that the claim of the

appellants must be limited to that place, and
that if in running down to the Bayou St. Phil-
ip, a sufficient quantity is not found to give
them the number of acres contained within a
league square by laying off the land on the
river, with the ordinary depth of forty, that the
side lines must be extended, so as to embrace
the whole superficies covered by the title, and
that the upper limit could not be extended be-
yond the boundary given by the sale.

Under the view we have already given of
the evidence, it is not proved that the *Bayou
Des Ecors*, was the boundary above. It is on-
ly spoken of in the commandant's certificate
and Varang's testimony.—The last has been
excluded, and the first does not prove the fact.

The course and direction of the side lines
next require consideration. All the witness-
es prove that the Bayou St. Philip or Bayou
La Bourne, was the dividing line between the
Pascagoulas, and Apalachia tribes of Indians;
as this was a natural boundary we think it
must form the lower limit on one side of the
river, and that the line of the upper boundary
on the same side should be extended to cor_
respond with the general course of the Bayou.
We are also of opinion that the direction of the

Western Dis.
October 1828,

MAES
*vs.*
GILLARD'S
HEIRS.

Western Dis, side lines on the opposite side of the river must
October 1828,
be conformable to these.    This is the mode in
MAES
*vs.*      which the commissioners of the United States
GILLARD'S
HEIRS.    contemplated the land should be located.

Giving therefore to the defendants the quantity contained within a square league, and lay-ing it off conformable to the universal usage prevailing at the time the lands were settled by the Indians, by so many arpents in front, with the depth of forty on each side of the river, as will embrace the quantity called for by the title; we have next to decide on the conflict produced by the upper tract of the defendants lying immediately above and adjoining the Indian title, which they derive from a conveyance by De Blanc, the grantee; and the lower tract of the plaintiff which he acquired from Trudeau.    We think the defendants'is a superior title and must prevail.    It is an order of survey, dated in 1795.    That opposed to it, is a settlement right, confirmed in 1818.

As to the plea of prescription, the defendants had no title beyond the quantity contained in a league square, they therefore required thirty years actual possession to enable them to hold under this title, and that is not shewn here.

It is therefore, ordered, adjudged and decreed, that the judgment of the district court be annulled, avoided & reversed, and it is further ordered, adjudged and decreed, that the defendants be quieted in their title and possession to the quantity of land contained within a league square, according to the following notes and bounds: Beginning at the mouth of the Bayou La Bourne at the point marked *F* on the plat of survey filed in this cause—thence along a line drawn at right angles, from the general course of said bayou for forty arpents back from the river, such a distance as by measuring forty arpents on each side of said line, will contain the superficies embraced by a square league. The said lines on the opposite side of the river from the Bayou La Bourne on the lower boundary; and the side lines on both sides of the river on the upper boundary, to be in conformity with the general course of said bayou from its mouth to the distance of forty arpents back.

And it is further ordered, adjudged and decreed, that the defendants be quieted in their title and possession, to a tract of land of twenty arpents front with the ordinary depth, lying above and adjoining the square league acqui-

red from the Indians, the side lines having the same course and direction as those of said league; and that the plaintiff be perpetually enjoined from asserting any title to the same by virtue of any title acquired by him previous to this time; and it is further ordered, adjudged and decreed that he pay costs in both courts.